The STATE of NEW MEXICO, ex rel. NEW MEXICO STATE HIGHWAY DEPARTMENT

v.

The UNITED STATES.

No. 105–76.

United States Court of Claims.

Nov. 18, 1981.

---

**32.** *Baker v. United States, supra* note 15, 222 Ct.Cl. at ——·, 614 F.2d at 265, 268–69.

Stephen S. Hamilton, Santa Fe, N. M., attorney of record, for plaintiff.

John W. Showalter, Washington, D. C., with whom was Asst. Atty. Gen., J. Paul McGrath, for defendant.

Before DAVIS and KASHIWA, Judges, SKELTON, Senior Judge.

## OPINION

PER CURIAM:

This case comes before the court on plaintiff's exceptions to the recommended decision of Trial Judge Harry E. Wood, filed December 5, 1980, pursuant to Rule 134(h), having been submitted to the court on the briefs and oral argument of counsel. Upon consideration thereof, since the court agrees with the trial judge's recommended decision, as hereinafter set forth *, it hereby affirms and adopts the decision as the basis for its judgment in this case. Therefore, it is concluded that plaintiff is not entitled to recover, and the petition is dismissed.

## OPINION OF TRIAL JUDGE

WOOD, *Trial Judge*: In this action, plaintiff sues to recover damages for breach of an agreement between plaintiff, acting through its State Highway Department ("SHD"), and defendant, acting through the Federal Highway Administration ("FHWA"), providing for federal participation in SHD's costs of acquisition of rights-of-way necessary to Federal Aid Project I–040–2(4).

The Project, and the agreement, involved the construction of a portion of United States Interstate Highway 40 ("Interstate 40") near Bluewater, New Mexico. The parties have stipulated that if defendant is now held obligated to participate in SHD's cost of acquisition of the parcel of land here relevant (called parcel 2–2–EL, and hereinafter described), plaintiff is entitled to judgment in the amount of $98,775. The question of defendant's liability *vel non* is, however, sharply disputed.

Plaintiff makes three principal arguments: first, that parcel 2–2–EL was an

---

* Although the court adopted the trial judge's separate findings of fact, which are set forth in his report, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

"uneconomic remnant", within the meaning of the act of January 2, 1971, 84 Stat. 1894, 42 U.S.C. § 4601 et seq. (1976),[1] and regulations in implementation thereof; second, that, even if not an uneconomic remnant, parcel 2–2–EL was acquired by SHD as "excess land", within the meaning of applicable FHWA regulations; and third, that the "damages suffered by parcel 2–2–EL" were in any event "of a type generally compensable in eminent domain", within the meaning of applicable FHWA regulations. Plaintiff concludes that, on the basis of any of these arguments, defendant is obligated to participate in SHD's cost of acquisition of that parcel.

Defendant's position is that on the facts of this case, the "uneconomic remnant" provisions advanced by plaintiff are inapplicable, but that in any event parcel 2–2–EL was not acquired as, and was not, an uneconomic remnant; that plaintiff's reliance upon FHWA "excess land" regulations is misplaced; and that since severance damages to parcel 2–2–EL were of a type not generally compensable in eminent domain, plaintiff is not entitled to any contribution from defendant toward the cost of acquisition of that parcel.

For the reasons hereinafter appearing, it is concluded that plaintiff is not entitled to recover.

I

On June 27, 1963, FHWA and SHD entered into Federal Aid Project Agreement I–040–2(4) ("the agreement") involving the construction of a portion of Interstate 40 from just west of what later became parcel 2–2–EL to a point southeast of Grants, New Mexico, some 10 miles or so to the east.[2] As proposed, and as built, Interstate 40, which passes through this area in a generally east-west direction, is basically parallel to old U.S. Highway 66 ("Route 66").

The agreement required that FHWA reimburse SHD to the extent of 92.51 percent of the acquisition costs of rights-of-way necessary to the Project, and obligated plaintiff to comply with Title 23, United States Code, regulations duly promulgated pursuant thereto, policies and procedures promulgated by the Administrator, FHWA, relative to the Project, and contractually specified terms and conditions.[3]

As of 1970, Mr. and Mrs. Claude Bowlin owned approximately 54 acres of land located along Route 66. The portion of that tract relevant to this case consisted of 15.49 acres on the south side of (and abutting) Route 66. Improvements known as the Thunderbird (or Bowlin's Running Indian) Trading Post ("the trading post") were located on these 15.49 acres. The primary and almost exclusive source of revenues of the trading post (which had been in operation at this location since about 1935) was sales of souvenirs, food, and gasoline to tourists traveling east or west through New Mexico.

The plans for the Project, agreed to by both FHWA and SHD, indicated that part (some 4.106 acres) of the larger 15.49-acre tract here relevant was needed for the Project. The 4.106-acre portion, designated parcel 2–2, was in fact fully incorporated into the right-of-way of Interstate 40. The remaining 11.384-acre portion (designated parcel 2–2–EL)[4] was, however, coded by SHD as an "excess land" parcel; that coding meant that parcel 2–2–EL was not to be used as part of the right-of-way of Interstate 40, and in fact no part of parcel

---

1. The act is titled the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970; in the interest of brevity, it is sometimes hereinafter referred to as "the 1971 act."

2. The Project was constructed in accordance with FHWA requirements, and was approved by FHWA.

3. Defendant does not contend or even suggest that it was not under like obligations.

4. All of the improvements on the 15.49-acre tract were on this parcel.

2–2–EL was incorporated into Interstate 40's right-of-way.[5]

In May 1970, following unsuccessful negotiations between SHD and Mr. and Mrs. Bowlin respecting acquisition of parcels 2–2 and 2–2–EL, plaintiff brought suit in a New Mexico State District Court to condemn the said parcels. On June 5, 1970, an order was entered making permanent the preliminary order of entry granted upon the filing of the condemnation action. The June 5, 1970, order provided that subsequent proceedings in the condemnation action would affect only the amount of compensation to be allowed in consequence of the condemnation.

On September 28, 1971, following trial, the New Mexico State District Court awarded Mr. and Mrs. Bowlin $133,383.93 [6] for the taking of parcels 2–2 and 2–2–EL. SHD's allocation of that sum between the two parcels ($22,189.43 to parcel 2–2, and $111,194.50 to parcel 2–2–EL) was accepted by FHWA, and is not questioned here. FHWA fully participated in (i. e., bore) 92.51 percent of SHD's cost of acquisition of parcel 2–2, but failed and refused to participate to any degree in SHD's cost of acquisition of parcel 2–2–EL. That failure and refusal is at the core of this litigation; if proper, plaintiff loses; if not, it is entitled to judgment in the stipulated amount of $98,775.

Parenthetically, by stipulation filed in the New Mexico State District Court June 5, 1970, SHD and Mr. and Mrs. Bowlin agreed that the latter might remain in possession and occupancy of parcels 2–2 and 2–2–EL until after their receipt of written notice from SHD to vacate the premises. Following June 5, 1970, Mr. and Mrs. Bowlin rented from plaintiff, and occupied, parcel 2–2–EL; they vacated the said premises in September 1973.[7]

## II

Plaintiff's first contention is that parcel 2–2–EL was an "uneconomic remnant", within the meaning of section 301(9) of the act of January 2, 1971, supra, and applicable FHWA regulations, and that, under a proper construction of relevant sections of that act, defendant is obligated to bear 92.51 percent of SHD's cost of acquisition of that parcel. Defendant contends that, on the facts of this case, the 1971 act is inapplicable to SHD's acquisition of parcel 2–2–EL, but that, in any event, parcel 2–2–EL was not an "uneconomic remnant".

Section 301 of the 1971 act provides in pertinent substance that heads of federal agencies "shall, to the greatest extent practicable, be guided by the following policies:"

\* \* \* \* \* \*

(9) If the acquisition of only part of a property would leave its owner with an uneconomic remnant, the head of the Federal agency concerned shall offer to acquire the entire property.

The 1971 act does not define an "uneconomic remnant". On July 19, 1974, however, FHWA defined such a remnant as "A remaining part of land, after a partial acquisition, that is of little or no utility or value to the owner." 39 Fed.Reg. 26416, July 19, 1974, 23 C.F.R. § 710.104(g) (1975). Both plaintiff and defendant assume that the 1974 definition is directly relevant here.[8] For purposes of plaintiff's "uneconomic remnant" argument, and without any discriminating analysis, that joint assumption may be, and is, accepted.

Plaintiff urges that, although the agreement antedated the 1971 act by a number of years, that act, properly construed, nonetheless obligates defendant to contribute to SHD's cost of acquisition of parcel 2–2–EL.

---

5. The improvements on parcel 2–2–EL were not physically changed or altered in any way following the taking of that parcel (hereinafter described).

6. The said amount consisted of a judgment of $128,750, plus interest and costs.

7. Additional facts will appear hereinafter in connection with the arguments to which they relate.

8. Defendant elsewhere relies on FHWA policies and procedures which antedated (and were assertedly "codified" in) FHWA's 1974 regulations.

Briefly, plaintiff's rather complex syllogism is as follows:

a. that, in the construction of the Project, plaintiff (or SHD) was bound, pursuant to the terms of section 305(1)[9] of the 1971 act, to comply with the policies specified in section 301;

b. that the provisions of section 301(9) obligated plaintiff to acquire uneconomic remnants created by the construction of the Project;

c. that, pursuant to the terms of section 211(c)[10] the 1963 agreement must be deemed amended to require federal participation in the cost of acquisition of parcel 2–2–EL as an uneconomic remnant (or, alternatively, that the date of acquisition of parcel 2–2–EL was after the effective date of the 1971 act, and that section 305(1) therefore directly requires such federal participation);[11] and,

d. that parcel 2–2–EL was acquired as, and was in fact, an "uneconomic remnant".

Defendant concedes that, following January 2, 1971, FHWA was authorized by statute to contribute to a state's cost of acquisition of a parcel of land outside of, and not incorporated in, an interstate highway right-of-way not only by way of severance damages, but also where the parcel was "*designated*" as an "uneconomic remnant" (emphasis supplied). It contends, however, (1) that since plaintiff (or SHD) acquired parcel 2–2–EL prior to January 2, 1971, the "uneconomic remnant" provisions on which plaintiff here relies were and are inapplicable, and (2) that, in any event, parcel 2–2–EL was not an "uneconomic remnant" within the meaning of the 1971 act.

After careful consideration, it is concluded that plaintiff's "uneconomic remnant" argument is an untenable one.

### A

Plaintiff's claim of right to federal participation in SHD's cost of acquisition of parcel 2–2–EL under sections 301(9), 305(1), and other provisions of the 1971 act cited above, commences with the proposition that parcel 2–2–EL "*was acquired as an uneconomic remnant.*" (Emphasis supplied.) Plaintiff's tacit recognition of the necessity for taking such a position is well founded.

Plaintiff contends that section 305(1) makes the federal real property acquisition policies in section 301 (including that stated in section 301(9)) binding upon SHD. At least insofar as post-January 2, 1971, acquisitions of real property are concerned, defendant does not dispute that contention. Section 301(9) provides that "If the acquisition of only part of a property *would leave* its owner with an uneconomic remnant, the head of the Federal agency concerned *shall offer* to acquire the entire property." (Emphasis supplied.)

As defendant obliquely suggests, the language of section 301(9), fairly construed, contemplates a recognition by "the head of the Federal agency concerned" that a par-

---

9. Section 305 provides in part as follows:

"* * * Notwithstanding any other law, the head of a Federal agency shall not approve any program or project or any grant to, or contract or agreement with, a State agency under which Federal financial assistance will be available to pay all or part of the cost of any program or project which will result in the acquisition of real property *on and after the effective date of this title*, unless he receives satisfactory assurances from such State agency that—

(1) in acquiring real property it will be guided, to the greatest extent practicable under State law, by the land acquisition policies in section 301 * * *." [Emphasis added.]

10. Section 211(c) provides in part as follows: "(c) Any grant to, or contract or agreement with, a State agency executed before the effec-

tive date of this title, under which Federal financial assistance is available to pay all or part of the cost of any program or project which will result in the displacement of any person on or after the effective date of this Act, shall be amended to include the cost of providing payments and services under sections 210 and 305."

Plaintiff asserts that the "displacement" of Mr. and Mrs. Bowlin occurred in September 1973, when they vacated parcel 2–2–EL.

11. As plaintiff sees this aspect of the matter, SHD did not "acquire" parcel 2–2–EL until September 28, 1971, the date of a monetary award for the taking of parcels 2–2 and 2–2–EL.

tial acquisition of real property would result in the creation of an "uneconomic remnant" as a prerequisite to his obligation to offer to acquire "the entire property", and thereby to eliminate the existence of the "uneconomic remnant".[12] To view that language otherwise would be to rewrite, not simply to construe, the statute.

The logical extension of that reasoning is that SHD, like "the head of the Federal agency concerned", can proceed under section 301(9) (and section 305(1)) to acquire "the entire property" (and to require federal participation under sections 301(9) and 305(1) in SHD's cost of acquisition of the "uneconomic remnant" portion thereof) only *after* a determination by SHD that a partial taking would result in the creation of such a remnant.

In this case, SHD's decision to take parcel 2–2–EL did not rest upon any determination that the parcel was an "uneconomic remnant" within the meaning of section 301(9) (and section 305(1)). In fact, SHD had made the decision to take, and had commenced condemnation proceedings directed toward, parcels 2–2 and 2–2–EL many months prior to enactment of the act of January 2, 1971, *supra*.[13]

The compensation to Mr. and Mrs. Bowlin for the taking of parcel 2–2–EL was not paid in consequence of a determination by SHD that parcel 2–2–EL was an "uneconomic remnant" within the meaning of section 301(9). Indeed, plaintiff did not even suggest to defendant, at any time prior to the commencement of this action, that SHD had made an "offer to acquire the entire property" of Mr. and Mrs. Bowlin because the acquisition of parcel 2–2 would leave parcel 2–2–EL an uneconomic remnant.

Put another way, sections 301(9) and 305(1) cannot fairly be construed to authorize or require federal participation in the cost of acquisition by SHD of a parcel of land asserted, retrospectively and some

years after the decision to take that parcel for other reasons had both been reached and fully effectuated, to *have been* an uneconomic remnant at the time of acquisition. Section 301(9)'s terms are wholly and plainly inconsistent with any such construction.

In light of the foregoing, and all else aside, SHD's acquisition of parcel 2–2–EL cannot properly be held to have imposed on defendant any obligation under the 1971 act to participate in SHD's cost of acquisition of parcel 2–2–EL.

### B

In any event, the question whether or not parcel 2–2–EL was an "uneconomic remnant" should be resolved, on this record, in defendant's favor.

In asserting otherwise, plaintiff contends that under the 1974 regulatory definition of an "uneconomic remnant" quoted hereinabove, a subjective decision, by Mr. and Mrs. Bowlin, as to the value of parcel 2–2–EL to them, and not its fair market value, is determinative of that question. The contention has no merit.

Plaintiff's stress on the regulatory phrase "to the owner" is misplaced. Section 301(9) (and section 305(1)) contemplate that the head of the federal agency concerned (or a SHD) has the power and duty to make a determination whether or not a remaining part of land would be an uneconomic remnant, not the owner of that parcel of land. Congress cannot logically be presumed to have entrusted that decision to the subjective conclusions of landowners. Bearing this and the sound proposition that statutory provisions may not be amended or repealed by mere regulatory terms in mind, plaintiff's interpretation of the regulation must be and is rejected.

There is some indication in the record that parcel 2–2–EL was, in the opinion of Mr. and Mrs. Bowlin, of little or no utility or value to them. There is also some opin-

---

12. See H.R.Rep. No. 91–1656, 91st Cong., 2d Sess. 24 (1970), reprinted in *U.S.Code Cong. and Admin.News*, 5850, 5873 (Vol. 3 1970).

13. That decision and action resulted from SHD's inability to acquire the parcels by negotiation, and its conclusion that, under state law, severance damages to parcel 2–2-EL "would approach 100% * * *."

ion testimony that parcel 2–2–EL had a relatively low post-taking fair market value at various times. The record also reflects, however, that, in *SHD's* opinion, parcel 2–2–EL had a fair market value, even well after the taking, of $23,500.

Moreover, from June 1970 to September 1973, Mr. and Mrs. Bowlin rented parcel 2–2–EL from SHD (albeit the record does not indicate at what cost). Further, possible uses for parcel 2–2–EL, even in its post-taking condition, included light industrial or commercial use, or use as a trailer park. On this record, parcel 2–2–EL has not been shown to be an "uneconomic remnant", within the meaning of section 301(9). *Cf. Nall Motors, Inc. v. Iowa City, Iowa*, 410 F.Supp. 111 (SD Iowa 1975), *aff'd* 533 F.2d 381 (8th Cir. 1976).

### C

For the foregoing reasons, plaintiff's claim of right to federal participation in the cost of acquisition of parcel 2–2–EL as an uneconomic remnant is plainly not a valid one. Accordingly, a number of other complex and difficult issues involving the interpretation of various portions of the 1971 act need not be reached.

### III

Plaintiff further asserts that, should its "uneconomic remnant" argument be rejected, defendant is still obligated by the terms of FHWA Policy and Procedure Memorandum 80–1, March 20, 1969 ("PPM 80–1"), to participate in SHD's cost of acquisition of parcel 2–2–EL; it alleges that "parcel 2–2–EL was acquired as excess land and as such federal participation is required." Defendant denies that PPM 80–1 has the claimed effect.

As in force during the period here relevant,[14] paragraph 3, PPM 80–1, provided in pertinent substance that participation of federal funds in right-of-way and property damage costs incurred by states for high-

way projects financed in whole or in part with federal funds was permitted when, among other things, "such costs are incurred pursuant to and in conformity with State law, except as provided in * * *" paragraph 5n, PPM 80–1.

Paragraph 5n, PPM 80–1, explicitly provided that payments made for, among other things, "loss of business or good will, circuity of travel and diversion of traffic, or other items of damage not generally compensable in eminent domain, are not considered eligible for Federal participation", but that federal funds "will participate in payments made for loss or impairment of access if such payments are based upon elements of damage generally compensable in eminent domain."

Paragraph 7, PPM 80–1, "Federal Participation in Excess Takings", provided in pertinent part as follows:

a. Where a portion of a parcel is required for right-of-way for a Federal-aid highway project and the State desires to acquire the whole property, Federal participation will be in accordance with subparagraphs (1) and (2) below, whichever procedure the State has selected for Statewide application under its "35 Point" statement.

(1) Federal participation will be limited to the fair market value of the portion of the property required for the highway project plus severance damages, if any, to the remainder supported by appraisals prepared on the before and after method of valuation with benefits considered in accordance with State law; or

(2) As an alternate procedure, the State may be reimbursed as follows:

(a) First, by an initial installment representing the Federal pro-rata share of the cost of the portion of the land acquired and used for right-of-way or other uses as specified in paragraph 5q, determined by pro-rating the cost of the entire tract of land only, on an area basis be-

---

**14.** In 1974, FHWA promulgated regulations "pertinent to the acquisition of real property for highway and related purposes." 39 Fed. Reg. 26416, July 19, 1974, 23 C.F.R. Part 710

(1975). There seems to be agreement that PPM 80–1 was "codified" in those regulations. PPM 80–1, dated March 20, 1969, purported to have an effective date of July 1, 1967.

tween the portion used for right-of-way and the remaining portion lying outside the right-of-way plus the cost of any improvements necessarily removed because of the right-of-way taking, less appropriate credit for the salvage value of such improvements.

(b) Second, by a final installment representing the Federal share of the damages to the remainder of the land and improvements lying outside of the right-of-way. Such damages may be determined in either of the following ways:

*1* Where the State disposes of the excess property by public sale in the manner described hereinafter at any time up to the submission of the final voucher on the right-of-way project or two years after the opening to traffic of the highway project for which such right-of-way was acquired, whichever is earlier. The damages to the remainder will be considered to be the difference between the sale price and the initial cost of the excess property determined by the proration of the cost of the entire tract as provided hereinabove, provided the former is the lesser amount. * * *

Totally ignoring paragraphs 3, 5n, 7a, and 7a(1), for present purposes, plaintiff focuses narrowly and solely upon the provisions of paragraph 7a(2). It contends that paragraph 7a(2) provides an "alternative" (and, apparently, independent) basis for requiring federal participation in SHD's cost of acquisition of parcel 2–2–EL. The contention fails on analysis.

When paragraph 7a is considered in conjunction with, and as an integral part of, FHWA policies and procedures (or regulations, as the parties have treated PPM 80–1) governing the acquisition of real property for highway and related purposes as a whole, the intent and effect of the two alternatives specified therein is crystal clear.

Under the first alternative, defendant was obligated to participate in the cost of acquisition of "excess" land only to the extent of "severance damages, if any," to the excess land; with respect to such excess land, not incorporated into a highway right-of-way, defendant was obligated to participate in such "severance damages" only where FHWA policies (or regulations) expressly so provided.[15]

Paragraph 7a(2) does not expand the scope of that obligation. The contrary interpretation urged by plaintiff would obliterate the careful limitations upon federal participation in a state's cost of acquisition of real property spelled out in paragraphs 3 and 5n, and indeed in paragraph 7a itself. Such a result should be avoided, especially where, as here, paragraph 7a(2) has, and unmistakably conveys, another far more logical meaning.

Paragraph 7a(1) (in conjunction with other provisions of PPM 80–1) specified limitations on the extent of federal participation in a state's "excess takings", and set out a method by which the amount of that participation might be determined. All that paragraph 7a(2), properly construed, did was to add an "alternate procedure" (or method) for determining the *amount* of federal participation, if any, in the cost of acquisition of land not required for a highway project, but nonetheless acquired by a state in an excess taking. Put in slightly different terms, paragraph 7a(2) did not expand the kinds of situations in which federal participation was mandated, but rather prescribed an alternate method for arriving at the amount of such participation when otherwise due.

Plaintiff's "excess land" contention has no validity.[16]

### IV

Plaintiff finally contends that "the damages caused parcel 2–2–EL are generally

---

**15.** Plaintiff makes no claim under paragraph 7a(1) as such; whether federal participation in "severance damages" to parcel 2–2–EL is required pursuant to other provisions of PPM 80–1 will be considered in Section IV, *infra*.

**16.** The proof does not establish that plaintiff selected the alternate "procedure * * * for Statewide application under its '35 Point' statement." It is, however, unnecessary to rest rejection of plaintiff's "excess land" claim to reimbursement on that ground.

compensable in eminent domain", thus obligating defendant, pursuant to paragraphs 3 and 5n of PPM 80–1, to participate in SHD's cost of acquisition of that parcel.[17] More particularly, plaintiff asserts that parcel 2–2–EL suffered substantial "severance damages", that plaintiff was obligated under New Mexico law to compensate Mr. and Mrs. Bowlin for such damages, and that the primary causes of such damages were the "loss of direct access to Interstate 40", "the loss of the view or sight distance from Interstate 40 that the Thunderbird Trading Post once enjoyed", and "the inability of such business to make up for the sight distance problem by the erection of highway signing."

Plaintiff asserts, among other things, that "but for the loss of direct access to Interstate 40", there would have been no damage to parcel 2–2–EL, even with a diversion of traffic from Route 66 onto the new segment of Interstate 40 south of parcel 2–2–EL following completion of construction and opening. Plaintiff goes on to conclude that this proves that loss of direct access to Interstate 40, rather than diversion of traffic, "was the real cause of damage to parcel 2–2–EL."

Defendant does not deny the fact (or amount) of severance damages, nor does it question plaintiff's obligation to compensate Mr. and Mrs. Bowlin for such damages under state law. It does contend, however,

that diversion of traffic from Route 66 to Interstate 40, and not other causes, occasioned them, and that, pursuant to paragraph 5n, PPM 80–1, federal participation in SHD's cost of acquisition of parcel 2–2–EL is accordingly prohibited.

The issue to be resolved is essentially a factual one. The facts concerning access to parcel 2–2–EL, both prior to and after the opening of the segment of Interstate 40 [18] constructed pursuant to the agreement, are detailed in the findings, and will be only summarized here.

In brief terms, the proof is that, prior to the construction and opening of that segment of Interstate 40, parcel 2–2–EL did not abut Interstate 40; that, prior to such construction and opening, there was no "direct access" to parcel 2–2–EL from Interstate 40, and that there could not have been any loss of such "direct access" upon the opening of that segment of Interstate 40; that ingress to (and egress from) parcel 2–2–EL from (and to) Route 66 [19] was unaffected by such construction and opening; and that severance damages to parcel 2–2–EL from such construction and opening were the result of diversion of tourist traffic from Route 66 to Interstate 40,[20] not of loss or impairment of access to Interstate 40, loss of visibility, or loss of signability.[21]

Plaintiff does not contend that paragraph 5n, PPM 80–1, precluding federal participa-

17. Plaintiff's brief cites "23 CFR § 710.304(h)" as the governing regulation. As noted, FHWA regulations were promulgated July 19, 1974. Defendant asserts that paragraph 5n, PPM 80–1, "controls whether FHWA should have reimbursed plaintiff." The PPM and the regulation are, for purposes of this case, substantially identical. The provisions of PPM 80–1 will be employed in discussing this issue, however, since the cited regulation was promulgated long after the events here relevant had occurred.

18. Interstate 40 was an access-controlled highway. The Interstate 40 interchanges nearest parcel 2–2–EL were about a mile and a quarter to the east, and about five or six miles to the west, of parcel 2–2–EL.

19. Parcel 2–2–EL did abut Route 66, both before and after the opening of Interstate 40. Route 66 was not (and is not) access controlled.

20. Traffic flow on Route 66 past parcel 2–2–EL (some 9,000 or more cars per day shortly prior to the opening of the completed segment of Interstate 40 to traffic) decreased after that opening to less than 800 cars per day. Post-opening traffic was primarily local rather than tourist.

21. At most, parcel 2–2–EL lost "access" (in a very narrow sense of that word) to a temporary connecting link between Route 66 and a theretofore completed portion of Interstate 40; both that portion of Interstate 40 and the connecting link itself were, however, west of parcel 2–2–EL. There was no direct access to parcel 2–2–EL from any public highway save Route 66 prior to the taking, and that direct access was not destroyed or even impaired by the taking.

tion in severance damages caused by diversion of traffic, is either invalid or inapplicable. *Cf. People of California v. United States*, 213 Ct.Cl. 329, 551 F.2d 843, *cert. denied*, 434 U.S. 857, 98 S.Ct. 180, 54 L.Ed.2d 130 (1977). Its claim of severance damages in consequence of loss of direct access to Interstate 40, loss of visibility, and loss of signability, and not in consequence of a diversion of traffic from Route 66 (where access to parcel 2–2–EL was unchanged) to Interstate 40 is factually unsupportable.[22] Accordingly, plaintiff's claim of right to federal participation in the cost of acquisition of parcel 2–2–EL pursuant to paragraph 5n's "loss or impairment of access" terms must be denied.

### V

Each of the several grounds urged by plaintiff as obligating defendant to participate in SHD's cost of acquisition of parcel 2–2–EL ("uneconomic remnant", "excess land", or "severance damages") lacks substance. Accordingly, plaintiff is not entitled to recover, and the petition should be dismissed.

### CONCLUSION OF LAW

Upon the findings of fact and the foregoing opinion, which are adopted by the court, the court concludes as a matter of law that plaintiff is not entitled to recover and the petition is dismissed.

---

**22.** The authorities cited by plaintiff have been carefully considered, but are inapposite here. Despite plaintiff's repeated charge that there was a "loss * * * of direct access to Interstate 40 * * *", no such loss (or impairment) of access to *Interstate 40* occurred, and access to Route 66 was neither lost nor impaired in any way.