PLAGER, Circuit Judge.
In this case, plaintiff, an officer in an Army reserve component, sought back pay, retirement pay, reinstatement and correction of records. His claim was based on 10 U.S.C. § 1163(d), the “sanctuary” provision, which provides that members of a reserve component are, under specified circumstances, protected from involuntary release prior to qualifying for retirement. Before us is an appeal from a judgment of the Claims Court entered May 22,1989, and reported as Wilson v. United States, 16 Cl.Ct. 765 (1989). Both Lieutenant Colonel (LTC) Wilson and the United States moved in the trial court for summary judgment. LTC Wilson’s motion was based on a decision of this court, Ulmet v. United States, 822 F.2d 1079 (Fed.Cir.1987). The Claims Court granted LTC Wilson’s motion, holding that he is entitled to sanctuary under § 1163(d). The United States appealed pursuant to 28 U.S.C. § 1295(a)(3). We reverse.
I. The Factual Background
Wilson enlisted in the United States Army on July 5,1963. In 1965, he received a commission as a second lieutenant in the United States Army Reserve; in 1966 his reserve commission was converted to one in the Regular Army. On February 1, 1980, with the rank of captain, but having twice failed selection to the rank of major, Wilson was discharged from the Regular Army. At the time of his discharge, Wilson had served over sixteen years on active duty.
Subsequently, Wilson became a member of the Army Reserve and attained the rank of lieutenant colonel. After performing several active duty for training tours, Wilson received orders to report by October 3, 1983 to Fort McPherson, Georgia, for a special active duty for training (SADT) tour[1] of 179 days, to and including March 28, 1984.
*531 While serving on the SADT tour, LTC Wilson wrote to Army headquarters in Washington, D.C. requesting that, because he had now completed more than 18 qualifying years of Army service, he be retained on active duty pursuant to the “sanctuary” provision of 10 U.S.C. § 1163(d). If the Army responded to LTC Wilson’s letter, it is not of record. On March 28, 1984, when his SADT tour expired, LTC Wilson was released from his tour of active duty for training and returned to civilian status.
On August 10, 1984, Wilson submitted a request that he be recalled to active duty in order to complete 20 years of service for retirement purposes. Army officials disapproved this request by a written response dated October 5, 1984.
On January 5, 1985, Wilson’s counsel wrote the Secretary of the Army requesting that Wilson be reinstated to active duty so that he could complete his 20 years of 'active duty and retire with benefits. By a letter dated February 22, 1985, William D. Clark, Principal Deputy Assistant Secretary (Manpower and Reserve Affairs), provided LTC Wilson’s attorney, Avery T. Salter, the basis for the Secretary’s denial of LTC Wilson’s request, stating (in relevant part):
Section 1163(d), 10 United States Code, does not give Reserve members who complete 18 years active federal service (AFS) while on Active Duty for Training (ADT) or Special Active Duty for Training (SADT) the right to be continued on active duty solely for the purpose of completing 20 years of service for retirement purposes. Officers on ADT/SADT should understand that future service in an ADT/SADT status is based upon valid requirements as determined by the Department of the Army rather than upon the amount of AFS accumulated by the officer.
While Major Wilson is not automatically entitled by law to further active duty, he is neither precluded from such service. However, future service depends upon the existence of a valid requirement and Major Wilson’s selection as the best qualified officer available. The Department of the Army retains the right to make such determinations.
On August 13, 1987, Wilson filed a complaint in the Claims Court seeking back pay, allowances and benefits from March 27, 1984, reinstatement to active duty, records correction and other relief. On October 14, 1988, the Claims Court issued an interlocutory order, as to liability only, in Wilson’s favor on cross motions for summary judgment. The Government petitioned this court for interlocutory review. In an order dated November 18, 1988, we denied the Government’s petition. Thereafter, the parties filed stipulated facts as to quantum in the Claims Court. On May 22, 1989, the Claims Court issued its final decision granting Wilson’s motion for summary judgment, incorporating therein “with limited modifications” its prior interlocutory order of October 14, 1988. Wilson v. United States, 16 Cl.Ct. at 766 n. 1. The Claims Court held, inter alia, that: under Ulmet v. United States, 822 F.2d 1079 (Fed.Cir. 1987), § 1163(d) entitled LTC Wilson to sanctuary; LTC Wilson, having affirmatively sought sanctuary under § 1163(d), was “involuntarily” released from service as that term is used in § 1163(d); and LTC Wilson’s involuntary release was not approved by the Secretary in accordance with § 1163(d).
II. The Legal Background
A.
Although the details of each Service’s program may vary, tailored as they are to meet the differing needs of the particular *532 Service, the basic structure of the Federal Government’s plan for eligibility for retirement of military officers is fairly straightforward. The plan addresses two basic categories of officers. There are career officers who complete twenty or more years of full-time active military service. These officers typically enter through one of the Service academies or through one of the special officer training programs designed for that purpose.[2] These officers usually are given “regular,” as distinct from “reserve” commissions, although some number of officers with initial “reserve” commissions remain in the service and make it a career.
By law and regulation, these full-time career officers, both regular and reserve, are entitled to retire from the Service, regardless of age, with a substantial pension upon completion of twenty or more years of service. See 10 U.S.C. §§ 3911 & 3991 (1988).
The system also provides retirement benefits for officers who, although not making a career of military service, complete the requisite number of years of creditable federal service. These may be officers who began with regular commissions and later decided not to make a career of the Service or are terminated involuntarily, but choose to remain affiliated, or they could be officers with an initial reserve commission who, upon completion of their full-time active duty obligation, remain active with a reserve component.
This second group of officers, reserve component officers, all of whom will hold commissions in the reserve, may be placed in the active reserve, where, while holding civilian jobs, they regularly drill evenings or weekends as part of the country’s citizen soldiery. The purpose is to have a cadre of trained and ready civilians able to augment the full-time forces in time of national need. As part of their readiness training, these officers typically go on an annual period of active duty for training, during which they work side-by-side with their full-time active duty counterparts.
Individuals who serve in these reserve components and who earn a total of twenty or more years of qualifying federal service — combining the active duty years with years of qualifying reserve time — are also eligible for a federal pension. Here, though, the pension is considerably less generous: it cannot be drawn until the retired reservist attains age 60, and the monthly stipend is only a fraction of that paid to the career officer who retires with twenty or more years of full-time service. See 10 U.S.C. §§ 1331, 1333 & 1401 (1988).
As a general proposition, whether an officer is retained on either full-time active service or in the reserves after an initial period of full-time active service, is a matter largely in the discretion of the Service concerned, based on the needs of that Service and its applicable rules and regulations, subject of course to governing law.
B.
In 1956, the Congress amended the Armed Forces Reserve Act of 1952 (AFRA), Act of July 9, 1956, Pub.L. No. 84-676, § 265, 70 Stat. 517, by adding a new section, initially codified as Section 1016 of title 50 of the United States Code. Section 1016 had eight subsections, and, according to the Senate Committee report, had two purposes. One was to provide readjustment payments to reservists who were involuntarily released from full-time active duty after an extended period of time in service. The other was to provide some degree of economic security as an inducement to reservists to stay on active duty, thus reducing unwanted attrition and its attendant costs to the Government. The statute did this by providing both readjustment payments to those ushered out before they completed eighteen years of active service, and a guarantee against involuntary separation for those who completed eighteen years, assuring them that they would get their “twenty.” This latter purpose was accomplished by subsection (d), which provided that:
Under regulations prescribed by the appropriate Secretary, which regulations *533 shall be as uniform as practicable, a member of a reserve component who is on active duty and is within two years of qualifying for retired pay, retirement pay, or retainer pay under any purely military retirement system, shall not be involuntarily separated from that duty before he qualifies for that pay unless his separation is approved by the appropriate Secretary.
50 U.S.C. § 1016(d) (Supp. IV 1956) (emphasis added).
Subsection (b) of § 1016 provided specific exclusions from “any payments” provided by the provisions of § 1016, one of which exclusions was “A person who is released from active duty for training.”[3] In addition, at the time this section was added to AFRA as part of title 50, § 101(b) of title 50 defined active duty as “full-time duty in the active military service of the United States, other than active duty for training.” (Emphasis added). The Congressional purpose was clear: if a Service permitted an officer holding a reserve commission to serve on full-time active duty for eighteen years, it could not then terminate that officer’s active duty assignment so as to deny the officer the opportunity to complete his or her twenty years and obtain the more desirable federal pension.
There are various explanations for this sanctuary provision. As officers rose in rank, a function of, among other things, time in service, the opportunities for promotion diminished — the rank structure is pyramidal. Whether regular officers were favored for retention and promotion over reserve officers is a matter of conjecture. In any event, the Congressional policy was clearly that if reserve commission officers were to be passed over for promotion and retention, at least they could, after enough years, be guaranteed their retirement. In addition, the early 1950’s, when the sanctuary provision was enacted, was also a time when many reservists from World War II who had remained in the active reserve were recalled to active duty in Korea. The possibility of completing twenty full-time years was now a viable alternative. While there was no magic to eighteen years as the cut-off, it provided a bright line for which to shoot.
In 1962, § 1016 of title 50 was recodified into title 10. In the recodification, § 1016 was severed so that subsections (a), (b), (c) and (f), (g), (h) became § 687(a)-(e), and subsection (d) became § 1163(d). Congress made some minor changes in the language of the statute, none of which were meant to change the substantive effect of the statute.[4] The 1962 version of § 1163(d) read:
*534 Under regulations to be prescribed by the Secretary concerned, which shall be as uniform as practicable, a member of a reserve component who is on active duty and is within two years of becoming eligible for retired pay or retainer pay under a purely military retirement system, may not be involuntarily released from that duty before he becomes eligible for that pay, unless his release is approved by the Secretary.
10 U.S.C. § 1163(d) (Supp. IV 1962).
At the time § 1016(d) of title 50 was recodified as § 1163(d) of title 10, § 101(22) of title 10, in contrast to § 101(b) of title 50, defined active duty to in'clude active duty for training. Other than the general comment that no substantive change was intended, Congress gave no recorded recognition to this difference.
Finally, in 1987, § 1163(d) of title 10 was amended by insertion of a parenthetical phrase to expressly provide that active duty does not include active duty for training. Section 1163(d) now reads:
Under regulations to be prescribed by the Secretary concerned, which shall be as uniform as practicable, a member of a reserve component who is on active duty (other than for training) and is within two years of becoming eligible for retired pay or retainer pay under a purely military retirement system, may not be involuntarily released from that duty before he becomes eligible for that pay, unless his release is approved by the Secretary.
10 U.S.C. § 1163(d) (1988).
III. Discussion
A.
The issue before us is how should the sanctuary provision of § 1163(d) be read during the intervening years of 1962 to 1987. It is clear that at the time of its enactment, in 1956, and until the 1962 reeodification, the sanctuary provision — originally codified as subsection (d) of section 1016 of title 50 — by the terms contained in subsection (b) of the same section and consistent with the general definition found in § 101 of title 50, applied only to members of a reserve component on active duty other than active duty for training. And since 1987, the Congress, upon having the issue called to its attention, reaffirmed this original intent by adding clarifying language specifically limiting sanctuary to members on active duty other than for training. In the interim — that is, between 1962 and 1987 — as a result of the 1962 recodification, the sanctuary provision stood severed from the remainder of original § 1016, and in a different title (title 10). As such it no longer was adjacent to the limiting exclusions of its original subsection (b), and it now was contained in a title with a definition of active duty that included active duty for training.
In deciding the question before us, we begin as in any case of statutory construction with the words of the statute. At the time in question — 1984—the statute used the phrase “on active duty,” and there was no controlling definition expressly provided in the specific statutory section. There are a variety of types of active duty — the active duty on which a career member serves full-time, the active duty for training on which reservists are ordered for reserve training, the active duty for training referred to as special active duty — and the decision as to which is encompassed in the phrase “active duty” is the issue before us; the Congress can hardly be said to have provided us with a plain meaning on the face of the statute.
*535 Yet the problem of ascertaining Congressional intent in this case is not difficult. We are not confronted with lengthy and conflicting committee reports, floor colloquies, and other secondary materials from which we are to divine the intent of the full body of the Congress. Instead we have the clear language of the statute at the time of its enactment, consistent with the definition of the term found in title 50. And we have the clear language of the 1987 amendment, designed to clarify what had been made unclear by the 1962 codifier’s reshuffling of the sections. Cf. Bell v. New Jersey, 461 U.S. 773, 784, 103 S.Ct. 2187, 2194, 76 L.Ed.2d 312 (1983) (“the view of a later Congress does not establish definitively the meaning of an earlier enactment, but it does have persuasive value”). The legislative history, if recourse is even needed, is entirely consistent. The House report accompanying the 1962 codification made clear that no substantive change was intended. The sponsors of the 1987 clarification described the added language as necessary to restore the original intent to the language of the section.
This case is not unlike Cass v. United States, 417 U.S. 72, 94 S.Ct. 2167, 40 L.Ed.2d 668 (1974), in which the Supreme Court construed another provision that was codified in title 10 in 1962. In 1956, Congress enacted a readjustment pay provision, Act of July 9, 1956, Pub.L. No. 84-676, § 265(a), 70 Stat. 517, that granted to certain involuntarily released members of a reserve component having “at least five years of continuous active duty” a readjustment payment computed in part upon the members’ “years of active service.” Id. at 73 & 79, 94 S.Ct. at 2168 & 2171. For purposes of computing the “years of active service” in determining the amount of readjustment payment, Congress provided the following rounding provision: “For the purposes of computing the amount of readjustment payment (1) a part of a year that is six months or more is counted as a whole year, and a part of a year that is less than six months is disregarded____” Id. at 79, 94 S.Ct. at 2171. In 1962, the language of the 1956 act was codified into § 687(a) of title 10, at which time the rounding provision, which became § 687(a)(2), was changed to read: “For the purposes of this subsection — ... (2) a part of a year that is six months or more is counted as a whole year, and a part of a year that is less than six months is disregarded____” Id. at 73-74, 94 S.Ct. at 2168-69 (emphasis added). In effecting the codification, Congress made it clear that it did not intend to make any substantive changes to existing law. Id. at 81, 94 S.Ct. at 2172.
The petitioners in Cass argued that, because the language of the rounding provision was changed to read “[f]or the purposes of this subsection,” it applied not only to the manner of computing the amount of the readjustment payment, but now it also applied to determining when a member became eligible, i.e., had “at least five years of continuous active duty.” In other words, the petitioners were of the opinion that as a result of the codification changes the rounding provision modified the word “years” wherever it was used in § 687(a). Under their interpretation, a member of a reserve component who accrued more than four years and six months, but less than five years, of continuous active service would be entitled to readjustment pay under § 687. The Court held otherwise, however, based, inter alia, on the ground that Congress did not intend to make any substantive changes to the law through the course of codification of the statutes. Id. at 81-82, 94 S.Ct. at 2172.
The Secretary of the Army’s long-standing interpretation of § 1163(d) — that Service members on ADT are not entitled to sanctuary — provides an independent basis on which we might reach the same conclusion.[5] See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-44, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984) (when a statute is silent or ambiguous with respect to the specific issue, the administrative agency’s *536 interpretation, if reasonable, is to be followed by the court).
In the face of a consistent record of Congressional intent, to the extent that intent has been expressed, and in light of the Army’s consistent, reasonable interpretation of the statute, see Chevron, supra, we conclude that, from its enactment to the present day, the sanctuary provision had one and only one meaning. It applies to a member of a reserve component who is on active duty other than for training, and not to one who, at the relevant time, is on active duty for training (or one of the variants thereof).
B.
The Claims Court in addressing the question of whether LTC Wilson had qualified for sanctuary considered that the issue of his basic eligibility under the statute had been settled by our decision in Ulmet v. United States, 822 F.2d 1079 (Fed.Cir. 1987). In Ulmet, the issue was whether a reserve officer could tack active duty for training service on to his prior active duty service (not for training) in order to qualify for sanctuary under 10 U.S.C. § 1163(d) (1982). Id. at 1081. This court reviewed the legislative history of § 1163(d) and held “that the time served by LTC Ulmet on active duty for training is to be included in computing the time required for sanctuary under section 1163(d), and retirement under 10 U.S.C. § 3911.” Id. at 1087.
The court discussed and rejected the Government’s argument regarding the legislative history of § 1163(d), and declined to give weight to the prior administrative and judicial construction that had been given to the section. Though the specific factual issue in Ulmet was different from that being considered today, the underlying legal issue is indistinguishable. We have revisited the legislative history of § 1163(d) in this case. Our examination has brought to light that the legislative history of the sanctuary provision demands a different result from that reached in Ulmet. Accordingly, Ulmet is overruled.[6]
IV. Conclusion
We hold that the phrase “on active duty” in 10 U.S.C. § 1163(d) does not include active duty for training. Assuming, as did the trial judge, that, for purposes of Wilson’s summary judgment motion on the question of sanctuary, Wilson’s status was active duty for training, it follows that he was not, on that basis, entitled to sanctuary.[7]
The grant of summary judgment in Wilson’s favor is vacated, and the case is remanded to the Claims Court for further proceedings consistent with this opinion.
VACATED AND REMANDED.
ARCHER, Circuit Judge, concurs in the result.

. Active duty for training tours range in duration from 1 to 179 days. According to the Government, the Department of Defense defines "Active Duty for Training (ADT)” as:
*531 ■An ADT tour under orders providing for automatic reversion to inactive duty status when the specified period of ADT is completed. ADT includes full-time attendance at formal specialized skill training, flight training, combat crew training, and professional development education programs intended to provide RC [Reserve Component] members with necessary skills and disciplines supporting RC missions. Special AD [Active Duty] for activities having a primary training content also is authorized as ADT [Special Active Duty for Training (SADT) ].
Brief for Appellant at 5 n. 5 (citing Department of Defense Directive No. 1215.6, Uniform Reserve, Training and Retirement Categories).

. Career officers may also be recruited from the enlisted ranks.

. 50 U.S.C. § 1016(b) (Supp. IV 1956), in pertinent part, provided:
(b) Persons not entitled to payment. (Emphasis in original)
The following persons are not entitled to any payments under this section:
(1) A person who is released from active duty at his own request.
(2) A person who is released from active duty for training. (Emphasis added).
******
It is arguable that subsection (b) was not intended to apply to subsection (d). Subsection (b) refers to “any payments.” While the consequences of the guarantee under subsection (d) are retirement payments, the subsection itself is in the nature of a guarantee of opportunity for eligibility for payments. These two subsections are discussed in the legislative history as follows:
The proposal is designed primarily to provide a readjustment payment for Reserve officers involuntarily released from active duty; the following classes of persons would not be entitled to such payments: * * * (2) those released from active duty for training;
By special provision, a Reserve officer on active duty and within 2 years of qualifying for retired or retirement pay could not be involuntarily separated from active duty before he so qualifies except with the approval of the Secretary of the military department concerned.
Acceptance of readjustment pay would not deprive a person of any retired or retirement pay or other retirement benefits from the United States to which he would otherwise become entitled. * * * *.
S.Rep. No. 2288, 84th Cong., 2d Sess. 2, reprinted in 1956 U.S.Code Cong. & Admin.News 3061, 3066 (letter from Robert T. Stevens, Secretary of the Army, to Hon. Sam Rayburn, Speaker of the House of Representatives (June 4, 1955)) (emphasis added).

. The Senate Report states:
This bill, as amended, is not intended to make any substantive change in existing law. Its purpose is to bring up to date title 10 of the *534 United States Code, by incorporating the provisions of a number of public laws that were passed while the bill to enact title 10 into law was still pending in the Congress, and to transfer to title 10, provisions now in other parts of the code.

******

Some changes in style and form have been made to conform the provisions to the style and form of title 10 as it now exists, but these changes do not affect the substance of any of the laws dealt with.
S.Rep. No. 1876, 87th Cong., 2d Sess. 2, reprinted in 1962 U.S.Code Cong. & Admin.News 2456.

. See, e.g., Letter from James D. Hopson, LTC., U.S. Army Congressional Coordinator, to Senator Rudy Boschwitz (Dec. 23, 1987); Letter from William D. Clark, Principal Deputy Assistant Secretary, to Avery T. Salter, Jr. (Feb. 22, 1985); and Army Reg. 135-200, ¶ 4-7(b)(4) (1983).

. The dissent’s solicitous concern for stare decisis is well stated but misplaced. The problem is not that we here overrule Ulmet, but that Ulmet overruled a longstanding administrative practice of the Government based on an interpretation of statutes going back more than thirty years. That this longstanding interpretation was what Congress intended was clearly evidenced by its 1987 amendment. We disagree with the dissent that this was not an intervening legislative development which removed or weakened the 'conceptual underpinnings’ of an earlier decision (quoting from Patterson v. McLean Credit Union, 491 U.S.-, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989)); the intervening legislative development destroyed them. As the dissent correctly observes, “Our duty is to apply what Congress enacted____”
The question of the retroactive effect, if any, of the 1987 amendment on other cases is not before us. Retroactivity has no bearing on this case, and thus the dissent’s discussion of the issue is not on point.

. Wilson has contested the issue of whether he was on active duty for training, arguing that his status was properly classified as active duty. Following the remand, the trial court will have that undecided issue before it.