**PEOPLE OF THE STATE OF CALIFOR-NIA, ex rel. DEPARTMENT OF TRANSPORTATION, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 193–87C.

United States Court of Federal Claims.

Oct. 30, 1992.

O.J. Solander, Sacramento, Cal., Atty. of Record, for plaintiff. Larry A. Thelen, State of Cal. Dept. of Transp. Legal Div., of counsel.

Brian A. Mizoguchi, Commercial Litigation Branch, Civil Div., Dept. of Justice, Washington D.C., with whom were David M. Cohen, Director, and the Asst. Atty. Gen., Attys. of record, for defendant. Lee Burstyn, Dept. of Transp., Federal Highway Admin., of counsel.

## OPINION

HORN, Judge.

### BACKGROUND

This case is before the court on cross-motions by the parties for summary judgment. Plaintiff, State of California, acting by and through the California Department of Transportation, brought this action pursuant to the Tucker Act, 28 U.S.C. § 1491 (1982). The jurisdiction of this court is uncontested by the parties.

In the original complaint filed with the court, plaintiff requested both money damages and declaratory relief. Plaintiff asserts a claim for damages arising from the government's alleged breach of a contract (referred to as the Project Agreement) which plaintiff alleges provides reimbursement from the Federal Highway Trust Fund for the costs of acquisition of rights of way in connection with the construction of Interstate 5, a federal aid freeway in the Sacramento County, California.

The parties subsequently filed a joint preliminary status report in which they agreed that the court had jurisdiction with respect to the first claim for damages pursuant to the contract. Defendant, however, asserted that the second claim, styled as a claim for declaratory judgment, was not within the Tucker Act jurisdiction of this court. Plaintiff, therefore, filed an amended complaint in which it modified its declar-

atory relief claim so as to also seek compensation for defendant's denial of reimbursement for inverse condemnation costs on the basis of breach of contract.[1]

After careful consideration of the briefs filed by the parties, the oral argument on the cross-motions for summary judgment, the supplemental filings submitted by the parties following the argument, and for the reasons discussed below, the court GRANTS the defendant's motion for summary judgment. Plaintiff's cross-motion for summary judgment is, therefore, DENIED.

## FACTS

On June 26, 1962, The State of California Department of Transportation (hereinafter, State), pursuant to a federal aid highway project, adopted a north-south route for Interstate 5, a federal aid freeway in Sacramento County, California. On November 9, 1965, the Federal Highway Administration (hereinafter FHWA) authorized the State to acquire the necessary right of way in Sacramento County from 0.1 miles south of Hood–Franklin road to 0.1 miles north of Elliott Ranch Road, "to proceed with preliminary work necessary for acquisition of the right of way, and for utility relocation, to negotiate for and purchase the right of way, to remove improvements, and to make payments for relocation assistance within the above limits." On February 17, 1966, the FHWA authorized the State to continue this acquisition, extending one mile northward from the Sacramento–San Joaquin County Line to the junction of proposed State Route 148.

Three undeveloped, contiguous parcels of land were affected by this right of way. Comprising a total of approximately 736 acres, these parcels, referenced in the pleadings as Blumenfeld, Moss and Freeport, paralleled the north south direction of the right of way, Blumenfeld to the north, Moss immediately south of Blumenfeld and Freeport immediately south of Moss. The right of way divided each of the three properties, leaving approximately one third of the subject property on the west side of the highway and two thirds on the east side.

On February 17, 1972, the State issued resolutions to condemn the properties. Thereafter, the State filed condemnation actions in the Sacramento Superior Court for partial taking from each of the properties, totalling 38.6 acres. The State's complaints in condemnation against the Blumenfeld and Freeport properties were filed on May 4, 1972. The condemnation action against the Moss property was filed on May 17, 1972.

On October 6, 1972, the State deposited with the Sacramento Superior Court security deposits based upon the State's appraisals of the probable amounts of compensation due the property owners: Blumenfeld, $78,237; Freeport, $60,200; Moss, $53,832. These deposits were withdrawn by the property owners. The Sacramento Superior Court entered Orders of Possession on October 11, 1972, for the Moss property, and on November 9, 1972, for the Blumenfeld and Freeport properties. The State took possession of the Moss property on December 12, 1972 and of the Blumenfeld and Freeport properties on December 15, 1972. Consequently, as is more fully discussed below, the court finds that December 12, 1972, respecting the Moss property, and December 15, 1972, respecting the Blumenfeld and Freeport properties, the dates on which the State took possession, are the appropriate dates by which to determine the applicable, governing regulations.

The property owners answered the State condemnation actions and filed cross-claims for damages under theories of inverse condemnation. The actions were consolidated for trial in the Sacramento Superior Court. According to the Joint Stipulations of Facts: "The State made no effort to bring the cases to trial within one year from the filing of its condemnation actions." Indeed, the trial for the consolidated cases commenced on July 1, 1974, more than two

---

1. Defendant explicitly consented to the filing of an amended complaint at a status conference before the court.

years after the cases were filed, resulting in a jury award of $297,043 for direct condemnation and severance damages to the three property owners. The jury found in favor of the State on the issue of inverse condemnation and declined to award damages.

On November 27, 1974, nearly nine years after the initial project authorization, the Interstate 5 Highway project, for which the three properties were acquired, was completed. Shortly thereafter, on December 6, 1974 the Sacramento Superior Court granted the property owners' motion for a new trial. In January, 1975, the State appealed the Superior Court's orders granting new trials. In February, 1975, the property owners cross-appealed the amount of the jury award. Pending the disposition of the appeals, the Superior Court ordered the State to make additional security deposits no later than April 28, 1975. The State failed to comply with the order of the Superior Court, but completed the deposits on May 1, 1975.

On December 10, 1975, the State and FHWA entered into a "Federal–Aid Project Agreement" (Project Agreement) for the segment of Interstate 5, subject to the November 9, 1965 and February 17, 1966 acquisition authorizations. This agreement estimates the total costs for the acquisition of the right of way at $2,198,000.00 and provides for allocation of federal funds in the amount of 1,978,000.00. The agreement further provides that:

> The State, through its Highway Department, having complied, or hereby agreeing to comply, with the terms and conditions set forth in (1) Title 23, U.S.Code, Highways, (2) the Regulations issued pursuant thereto and, (3) the policies and procedures promulgated by the Federal Highway Administrator relative to the above designated project, and the Federal Highway Administration having authorized certain work to proceed as evidenced by the date entered opposite the specific item of work, Federal funds are obligated for the project not to exceed the amount shown herein, the balance of the estimated total cost being an obligation of the State. Such obligation of Federal funds extends only to project costs incurred by the State after the Federal Highway Administration authorization to proceed with the project involving such costs.

On January 11, 1977, and again on January 31, 1978, the project agreement between FHWA and the State was modified to reflect increases in the estimated cost of the project and federal funds obligated.[2]

On May 28, 1979, the Court of Appeals of California affirmed the trial court's order for a new trial. The order of remittitur was filed on July 30, 1979. Again, according to the stipulated facts, "the State made no effort to retry the consolidated cases within one year from the filing of the remittitur." The second consolidated trial began on July 31, 1980, more than one year after the filing of the remittitur. At trial, the court addressed the issue of the correct date of valuation for assessing compensation due the property owners. The State asserted that the proper date of valuation on retrial should be July 1, 1974, the date of the first trial. The property owners asserted, however, and the state court agreed, that the correct date of valuation for the direct condemnation should be July 31, 1980. Moreover, the court, in its September 2, 1981 findings of fact and conclusions of law, ruled that an inverse condemnation of the landowners properties had occurred on January 1, 1967 and continued until July 31, 1980.

On July 8, 1982 the state court entered judgments stemming from the jury verdicts as to compensation and damages in the aggregate amount of $13,821,881.60. Significantly, the State did not appeal this decision. On August 17, 1982, the State

---

**2.** The January 11, 1977 modification revised the estimated total cost of the project from the $2,198,000.00 reflected in the December 10, 1975 agreement to $3,186,000.00. Accordingly, the federal funds figure (the portion of the project to be paid by the federal government) was revised from $1,978,000.00 to $2,868,000.00. The January 31, 1978 modification increased the total estimated cost of the project from $3,186,000.00 to $4,010,000.00. The federal funds amount was revised from $2,868,000.00 to $3,669,900.00.

and FHWA executed a third modification of the project agreement.

On April 21, 1983, Final Orders of Eminent Domain for the three properties were entered by the Sacramento Superior Court. Thereafter, the State requested that defendant reimburse its direct condemnation and inverse condemnation costs resulting from the judgments. By letter dated June 3, 1983, the State submitted a claim for inverse condemnation costs resulting from the highway project to Bruce Cannon, Division Administrator of the FHWA, following the court's decision in the state court case.[3] On July 2, 1984, the Regional Counsel, upon review of the State's claim for inverse and direct condemnation costs, disallowed inverse condemnation costs, but, with some reservation, allowed the costs of direct condemnation. After requesting and receiving additional information from the State concerning the nature of its condemnation action, specifically, the manner in which the state conducted its property acquisition and the condemnation litigation, FHWA determined that reimbursement should be denied for any portion of the state court award above and beyond the reimbursement already made of the federal share of the $297,043 awarded at the first trial. By letter dated July 17, 1984, William Kisselburg, Director, Office of Planning and Program Development, FHWA, disallowed the inverse condemnation claim. William Kisselburg also, although not very clearly, noted that the acquisition award (direct condemnation award) adjudged by the Sacramento Superior Court "was based on a questionable date of valuation." He, therefore, concluded that Federal reimbursement in this case should be limited to the fair market value which reflects the valuation on the date of possession by the State. The State, in a letter dated October 16, 1984, from Leo Trombatore, State Director of Transportation, to Bruce Cannon,

FHWA Division Administrator, requested FHWA to reconsider its denial of participation in the direct condemnation award. Then, on November 27, 1985, in a letter to the State, Bruce Cannon, the FHWA Division Administrator, stated that the FHWA had completed its administrative review of the material in the instant case and had determined that federal fund participation should be limited to the initial court award of $297,043, plus interest, as provided under 23 C.F.R. 710.304(5). Thus, the FHWA denied reimbursement for any portion of the state court award exceeding the $297,043 awarded at the first trial. Plaintiff, therefore, filed for relief in this court for the disallowed direct condemnation and inverse condemnation costs, and for related acquisition costs, which the State alleges were improperly withheld by FHWA.

## DISCUSSION

Summary judgment in the United States Claims Court is properly granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 56 of the Rules of the United States Claims Court (RUSCC) is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed. R.Civ.P.) and is similar in language and effect.[4] Both Rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RUSCC 56(c); Fed.R.Civ.P. 56(c). Rule 56(c) of the Rules of the United States Claims Court provides that in order for a motion for summary judgment to be granted, the moving party bears the burden of showing that there is no genuine issue of material fact

---

3. Although the record in this case does not appear to include a document reflecting a claim for costs incurred as a result of direct condemnation, the parties have stipulated to the State's request for direct condemnation costs.

4. In general, the Rules of the United States Claims Court (RUSCC) are closely patterned

upon the Federal Rules of Civil Procedure (Fed. R.Civ.P.). Therefore, precedent under the Fed. R.Civ.P. is relevant to interpreting the RUSCC, including RUSCC 56(c). *See Imperial Van Lines Int'l, Inc. v. United States,* 821 F.2d 634, 637 (Fed.Cir.1987); *Lichtefeld–Massaro, Inc. v. United States,* 17 Cl.Ct. 67, 70 (1989).

and is entitled to judgment as a matter of law. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Rust Communications Group, Inc. v. United States*, 20 Cl.Ct. 392, 394 (1990); *Lima Surgical Associates, Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States*, 20 Cl.Ct. 674, 679 (1990), *aff'd*, 944 F.2d 885 (Fed.Cir. 1991).

■ Disputes over facts which are not outcome determinative under the governing law will not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Summary judgment will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.; see also Uniq Computer Corp. v. United States*, 20 Cl.Ct. 222, 228–29 (1990).

■ When reaching a summary judgment determination, the judge's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249, 106 S.Ct. at 2510; *see, e.g., Cloutier v. United States*, 19 Cl.Ct. 326, 328 (1990), *aff'd*, 937 F.2d 622 (Fed.Cir.1991). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether it is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 250–52, 106 S.Ct. at 2511–12. When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

■ The fact that both parties have moved for summary judgment, based on the alleged absence of genuine issues of material fact, does not relieve the court of its responsibility to determine the appropriateness of summary disposition in the particular case. *Prineville Sawmill Co. v. United States*, 859 F.2d 905, 911 (Fed.Cir.

1988) (citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir.1987)). "Simply because both parties moved for summary judgment, it does not follow that summary judgment should be granted one or the other." *LewRon Television, Inc. v. D.H. Overmyer Leasing Co.*, 401 F.2d 689, 692–93 (4th Cir.1968), *cert. denied*, 393 U.S. 1083, 89 S.Ct. 866, 21 L.Ed.2d 776 (1969). *See also Levine v. Fairleigh Dickinson Univ.*, 646 F.2d 825, 833 (3d Cir.1981); *Home Ins. Co. v. Aetna Cas. & Sur. Co.*, 528 F.2d 1388, 1390 (2d Cir.1976). Cross-motions are no more than a claim by each party that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not establish that if one is rejected the other is necessarily justified. *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir.1968). The court must evaluate each party's motion on its own merits, taking care to draw all reasonable inferences against the party whose motion is under consideration. *Mingus Constructors, Inc. v. United States*, 812 F.2d at 1391.

The court agrees with the parties that this case presents no factual issues which would preclude judgment as a matter of law. Thus, this case may be resolved by summary judgment. The sole issue before the court is whether under the Federal–Aid Project Agreement the FHWA properly decided to deny the State's claim seeking additional federal funds to participate in the direct condemnation and inverse condemnation liability incurred by the State.

■ As a preliminary matter, this court notes that an agency's interpretation of its own regulations must be given substantial deference by a reviewing court. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 358–59, 109 S.Ct. 1835, 1850–51, 104 L.Ed.2d 351 (1989); *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945); *Mast Indus., Inc. v. United States*, 822 F.2d 1069, 1073 (Fed.Cir.1987); *Summit Contractors v. United States*, 21 Cl.Ct. 767, 779 (1990), *aff'd sub. nom., Ins. Co. of North America*, 951 F.2d 1244 (Fed.Cir. 1991). Indeed, administrative interpreta-

tion is "of controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Mast Indus., Inc.*, 822 F.2d at 1073, *quoting, Bowles*, 325 U.S. at 414, 65 S.Ct. at 1217.

■ Furthermore, the deference accorded by this court to formal regulations should be applied to interpretative rules such as the Policy and Procedure Memoranda issued by the agency, in this case the FHWA, as incorporated into the terms of the December 10, 1975 Federal–Aid Project Agreement. *California v. United States*, 561 F.2d 731, 734 (9th Cir.1977). The following, albeit lengthy, quotation from *California v. United States*, referred to immediately above, is of interest because in it the United States Court of Appeals for the Ninth Circuit addresses legal issues almost directly on point to those presented in the case at bar.

In this case, the Federal Highway Administration has interpreted its policy pertaining to interest payments in excess of 30 days, i.e., PPM [Policy and Procedure Memoranda] 80–4, ¶ 3i, as being applicable to rights of entry. While not dealing with a rule, the Supreme Court has held that an interpretation of a regulation by the issuing agency is entitled to great deference:

Since this involves an interpretation of an administrative regulation a court must necessarily look to the administrative construction of the regulation if the meaning of the words used is in doubt.... [T]he ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation.

*Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 413–14, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945); *accord, Udall v. Tallman*, 380 U.S. 1, 16–17, 85 S.Ct. 792 [801–802], 13 L.Ed.2d 616 (1965). *See also Northern Indiana Public Service Co. v. Porter County Chapter of the Izaak Walton League, Inc.*, 423 U.S. 12, 15, 96 S.Ct. 172 [174], 46 L.Ed.2d 156 (1975). Although the PPM may be an interpretative rule rather than a formal regulation, *see California ex rel. Dept. of Transportation v. United States ex rel. Dept. of Transportation, Federal Highway Administration, supra*, 547 F.2d [1388] at 1389–1390 [ (9th Cir. 1977) ]; *Lathan v. Brinegar*, 506 F.2d 677, 682 n. 6 (9th Cir.1974) (en banc), administrative construction provides the best indication of the issuing agency's intent in either case. Thus the same deference in interpretation is appropriate whether the PPM is a formal regulation or an interpretative rule. Accordingly, the issue before us is whether the Federal Highway Administration's interpretation of PPM 80–4, ¶ 3i as applicable to rights of entry is plainly erroneous or inconsistent with the memorandum.

*California v. United States*, 561 F.2d at 733–34. Accordingly, in the instant case, this court must determine whether the FHA's interpretation of its own regulations on a different question from that considered in the earlier case, as a basis for limiting federal participation to $297,-043.00, was clearly erroneous, inconsistent with the regulations or with the Policy and Procedure Memoranda. *California v. United States*, 561 F.2d at 734.

Plaintiff in its motion for summary judgment asserts that the federal law and regulations applicable to the federal participation agreement at issue are in Volume 39, C.F.R., July 19, 1974, which were in effect at the time the project agreement was signed on December 10, 1975. Plaintiff cites to *Jackson v. United States*, 216 Ct.Cl. 25, 36, 573 F.2d 1189, 1194 (1978), for the proposition that "the federal laws and regulations that are in effect at the time of contract govern its performance." Although, under most circumstances, the regulations in effect at the time of the contract execution govern its performance, the explicit language of the Federal–Aid Project Agreement, and the interpretation of an almost identical federal aid project reimbursement agreement, by the Court of Claims in *California v. United States*, 213 Ct.Cl. 329, 344, 551 F.2d 843, 851, *cert. denied*, 434 U.S. 857, 98 S.Ct. 180, 54 L.Ed.2d 130 (1977), compel this court to find otherwise. *See also New Mexico v.*

*United States*, 229 Ct.Cl. 99, 111 n. 17, 665 F.2d 1023 n. 17 (1981).

■ When interpreting the language of a contract, a court must give reasonable meaning to all parts of the agreement and not render any portion meaningless, or interpret any provision so as to create a conflict with other provisions of the contract. *Fortec Constr. v. United States*, 760 F.2d 1288, 1292 (Fed.Cir.1985); *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1555 (Fed.Cir.1983). Accordingly, without rewriting or varying terms, *George Hyman Constr. Co. v. United States*, 832 F.2d 574, 581 (Fed.Cir.1987); *Haehn Management Co. v. United States*, 15 Cl.Ct. 50, 59 (1988), *aff'd*, 878 F.2d 1445 (Fed.Cir. 1989), contract language should be given the plain meaning which would be derived by a reasonably intelligent person acquainted with the contemporaneous circumstances. *Hol–Gar Mfg. Corp. v. United States*, 169 Ct.Cl. 384, 389, 351 F.2d 972, 975 (1965); *Firestone Tire & Rubber Co. v. United States*, 195 Ct.Cl. 21, 30, 444 F.2d 547, 551 (1971); *John C. Grimberg Co. v. United States*, 7 Cl.Ct. 452, 456, *aff'd*, 785 F.2d 325 (Fed.Cir.1985).

According to plaintiff, the law and regulations applicable to determining the State's entitlement to recover damages for both the direct and the inverse condemnation, based on the state court proceedings, are those federal regulations in effect on December 10, 1975, the date on which the State and the FHWA entered into the Federal–Aid Project Agreement. This position simply ignores the contractual language by which plaintiff agrees that for activities already completed, such as land acquisition prior to the execution of the Federal–Aid Project Agreement, the State *has* complied with regulations extant at the time the events took place. Plaintiff's proposed reading of the contract renders the clause "having complied" included in the Federal–Aid Project Agreement meaningless. *See Fortec v. United States*, 760 F.2d at 1292.

The December 10, 1975 "Federal–Aid Project Agreement" provides in pertinent part:

[t]he State, through its Highway Department, *having complied,* or hereby agreeing to comply, with the terms and conditions set forth in (1) Title 23, U.S.Code, Highways, (2) the Regulations issued pursuant thereto and, (3) the policies and procedures promulgated by the Federal Highway Administrator relative to the above designated project, ... (emphasis added).

The language of this contract contemplates two scenarios for project aid agreements approved by the FHWA: (1) the agreements are signed regarding projects on which the state has already proceeded with all or some of the work necessary for the construction of the highway, and according to the terms of the agreement, the State agrees that it has complied with the statute, regulations and PPM's applicable to those activities at the time they took place, or (2) the terms of the contract clearly foresee that for those project activities that the State has not commenced, the applicable regulations will be those contemporaneously in effect at the time those activities are commenced.

■ The United States Court of Claims, when presented with the identical language in another Federal–Aid Project Agreement, previously held that the amount payable to the California division of Highways by the United States is governed by the regulations in effect at the time California became legally obligated to the property owner for the payment of right of way costs pursuant to state law. *California v. United States*, 213 Ct.Cl. 329, 344, 551 F.2d 843, 851, *cert. denied*, 434 U.S. 857, 98 S.Ct. 180, 54 L.Ed.2d 130 (1977). Similarly, in *New Mexico v. United States*, 229 Ct.Cl. at 111 n. 17, 665 F.2d at 1031 n. 17, the United States Court of Claims made clear that the controlling regulations are those in effect at the time of the events that gave rise to liability for which the State seeks reimbursement from FHWA. *Id.*

Thus, in the instant case, because the state court found that the State's inverse condemnation began on January 1, 1967, the regulations and FHWA Policy and Procedure Memoranda (PPM's), in effect as of

January 1, 1967, set forth the criteria by which the FHWA must determine the extent to which the federal government may participate in inverse condemnation costs. Furthermore, the taking by direct condemnation took place for the Moss property on December 12, 1972 and on December 15, 1972 for the Blumenfeld and Freeport properties, the respective dates on which the State took actual possession of those properties. Thus, the statute, regulations and PPM's effective in December, 1972 apply to the FHWA determination with respect to the direct condemnation claim.

■ Retroactive application of the regulations effective at the time of the signing of the Federal–Aid Project Agreement is contrary to general principles of law. Because retroactivity is not favored in the law, congressional enactments and administrative rules will not be construed to have retroactive effect, absent specific mandatory language. *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208, 109 S.Ct. 468, 471, 102 L.Ed.2d 493 (1988) (citing, *Greene v. United States*, 376 U.S. 149, 160, 84 S.Ct. 615, 621, 11 L.Ed.2d 576 (1964); *Claridge Apartments Co. v. Commissioner*, 323 U.S. 141, 164, 65 S.Ct. 172, 185, 89 L.Ed. 139 (1944); *Miller v. United States*, 294 U.S. 435, 439, 55 S.Ct. 440, 441, 79 L.Ed. 977 (1935); *United States v. Magnolia Petroleum Co.*, 276 U.S. 160, 162–163, 48 S.Ct. 236, 237, 72 L.Ed. 509 (1928)). The United States Court of Appeals for the Federal Circuit has adopted the *Bowen v. Georgetown University Hospital* standard, holding that, absent specific direction to the contrary, a new statute applies only prospectively because such a position "has the benefit of fairness and common sense." *Wilson v. United States*, 917 F.2d 529, 537 (Fed.Cir.1990).

Moreover, no such retroactive language is discernible in 23 U.S.C. § 101(a), 23 C.F.R. § 316[5] or 23 C.F.R. § 710.303(g), cited to by plaintiff in its motion for summary judgment. In the instant case, to apply 1988 regulations, as mentioned in the text of its brief or even the July 19, 1974 version of the regulations referred to in the caption of Part I of plaintiff's brief, would create the absurd situation in which the plaintiff would have been required to act in accordance with a statutory and regulatory and Policy and Procedure Memoranda standard not even in existence on the January, 1967 date held to apply to the inverse condemnation, or in December, 1972, the approximate date of the physical taking of the Blumenfeld, Moss and Freeport properties.

The regulations limiting federal participation which were in effect at the time of the 1967 inverse condemnation and the 1972 direct condemnation are substantially identical to each other, and provide in pertinent part:

> § 1.9  **Limitation on Federal participation.**
>
> Federal-aid funds shall not participate in any cost which is not incurred in conformity with applicable Federal and State law, the regulations in this part, and policies and procedures prescribed by the Administrator. Federal funds shall not be paid on account of any cost incurred prior to authorization by the administrator to the State highway department to proceed with the project or part thereof involving such cost.

23 C.F.R. § 1.9 (1967). *See also* the identical text in 23 C.F.R. § 1.9 (1972). This regulation, in mandatory terms, prohibits federal fund participation in any cost incurred in violation of federal or state law, the regulations set forth in the C.F.R., or as prescribed by policies and procedures of the Administrator of FHWA.

In addition, 23 C.F.R. section 1.32 clearly grants to the administrator the power to promulgate such policies and procedures:

> § 1.32  **Policies and procedures**
>
> The Administrator shall promulgate and require the observance of such policies and procedures, and may take such other action as he may deem necessary for carrying out the provisions and pur-

---

5.  In the volume of 23 C.F.R., revised as of April 1, 1988, no section 316 is included in the regula-

tions.

poses of the Federal laws and the regulations of this part.

23 C.F.R. § 1.32 (1967).[6] By the terms of section 1.32, the Administrator is directed to promulgate policies and procedures to impose limits on federal participation. Furthermore, the Administrator is granted the discretion to take "other action," including actions he may deem necessary to limit federal liability.

In accordance with 23 C.F.R. § 1.9, the Administrator issued Policy and Procedure Memorandum (PPM) 21–4.1 which provides that:

> 3. General Provisions
>
> a. Under Federal law and regulations, participation of Federal funds is permitted in right-of-way and property damage costs incurred by the States for highway projects financed in whole or in part with Federal funds under the circumstances and to the extent set forth below:
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> b. There may be participation of Federal funds, not to exceed the extent set forth in Paragraph 3a in severance or consequential damages or both resulting from a highway improvement project upon an *affirmative showing* that the State highway department is obligated to pay such damages under State Law, and *such damages are of a type generally compensable in eminent domain and are determined by Public Roads to be generally reimbursable on Federal-aid highway projects.*

U.S. Department of Commerce, Bureau of Public Roads Policy and Procedure Memorandum 21–4.1 §§ 3(a)–3(b) (December 30, 1960) (emphasis added). The language of the PPM clearly indicates that participation of federal funds is a discretionary determination, approval of which is subject to an affirmative showing by the State, and a finding by the FHWA, that the damages incurred by the State, as a result of the property acquisition, are generally compensable in eminent domain, and generally reimbursable, as determined by the Administrator. Thus, according to PPM No. 21–4.1, the burden lies with the States to show the appropriateness of the acquisition costs for reimbursement.

The standards for determining whether a cost is generally compensable in eminent domain is specifically set forth and subject to additional limitations included in PPM 21–4.1, as amended October 17, 1963. It provides in pertinent part:

> k. Payments made for personal property, loss of business or good will, circuity of travel and diversion of traffic, or any items of damage not generally compensable in eminent domain, are not considered eligible for Federal participation nor will Federal funds participate in payments made for loss or impairment of access so long as the landowner retains or is furnished reasonable access to an existing public highway, to a frontage road, or to any other part of the public highway system. Reasonable access shall be determined in all cases without regard to circuity of travel or diversion of traffic within the public highway system.

---

**6.** The version of 23 C.F.R. § 1.32 in effect in 1972 incorporates, without material change, the provision set forth in the 1967 volume. However, it is supplemented by a limiting clause which provides:

> No such direction, policy, rule, procedure, or interpretation contained in the Federal Highway Administration order or memorandum shall be considered a regulation or create any right or privilege not specifically stated therein.

23 C.F.R. § 1.32(a) (1972). Subsection b of section 1.32 goes on to define the various types of memoranda promulgated by the Administrator most specifically:

> (2) Federal Highway Administration policy and procedure memorandums (PPM's).

These memorandums set forth policy and procedural requirements for Administration programs.

However, despite the slight qualification in the 1972 version of 23 C.F.R. § 132, even if not accorded the same weight as regulations in the 1972 C.F.R., PPMs are, nonetheless, characterized as "requirements" which when read in conjunction with the broad discretion accorded to the Administrator in section 1.32(a), should be accorded deference by this court. *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 358–59, 109 S.Ct. 1835, 1850–51, 104 L.Ed.2d 351 (1989); *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 413–14, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945); *California v. United States,* 561 F.2d 731, 734 (9th Cir.1977).

As with the other Policy and Procedure Memoranda, this document places no limits on the proper exercise of the administrator's discretion to deny federal participation in acquisition costs. However, it states very explicitly, and in mandatory terms, the costs which are not eligible for federal participation.

Finally, Attachment 2 to PPM 21–4.1 sets forth standards for the conduct of litigation which must be met by the State in order to qualify for federal funds:

> Public Roads does not question the judicial action of State Courts. However, if Federal funds are to participate in costs of rights-of-way determined by condemnation proceedings, we must be assured that the court and jury have *had the benefit of a sound presentation of the State's case, and that the State has reasonably exercised all appropriate legal procedures*, such as motions for new trial or remittitur, or taking an appeal. (emphasis added).

This Attachment to the PPM, by its terms, notes that participation of federal funds is contingent on assurances that the State has properly presented its case and reasonably exercised all appropriate legal procedures. The United States Court of Claims has in other circumstances characterized the duty of reasonableness as a duty to "proceed prudently, wisely, and efficiently." *Pennsylvania v. United States*, 226 Ct.Cl. 444, 456, 643 F.2d 758, 765, *cert. denied*, 454 U.S. 826, 102 S.Ct. 117, 70 L.Ed.2d 101 (1981). Thus, the issue is whether the State, in the prosecution of the condemnation cases at the State level, acted prudently, wisely and efficiently in exercising all appropriate legal procedures.

On December 6, 1974 the state trial court granted the motions of the landowners for new trials. The State appealed this decision, which resulted in a decision by the California Third District Court of Appeal, filed May 28, 1979, wherein the order granting the new trial to the Landowners was affirmed. As reflected in the Joint Stipulation of Facts filed in this court and in the copy of the Settled Findings of Fact and Law of the Sacramento Superior Court included in the record, the State did not file any motion to set the cases for retrial, making no effort to retry these cases within one year from the filing of the remittitur, resulting in delay that the state court termed "excessive, unjustified" and "unreasonable." The cases were retried by motion of the landowners on July 31, 1980.

■■■ Defendant contends and the record of proceedings before the Sacramento Superior Court reflects that the decision of the Sacramento Superior Court to set the July 31, 1980 date of valuation for the direct condemnation and inverse condemnation claims is a result of the State's failure to comply with state law. Although the State took possession of the subject properties in November and December of 1972, the State made no effort to bring the consolidated cases to trial within one year from the filing of the condemnation actions as required by California law. Indeed, the first trial did not commence until July 1, 1974.

The Sacramento Superior Court, in its Settled Findings of Fact and Law described the conduct of the State in its condemnation proceedings in the following terms:

> 67. ... Nothing has been or could be achieved on a voluntary basis because State has been implacable and refused to negotiate any change in the project as in these Findings described. No evidence was presented to explain or justify the implacable and non-negotiable conduct of the STATE regarding access and attempts of LANDOWNERS to obtain same.

> \*        \*        \*        \*        \*        \*

> 77. By January 1, 1967, the cumulative effect of STATE's precondemnation conduct did directly interfere with LANDOWNERS' beneficial use, possession, and enjoyment of their lands.

> 78. Prior to January 1, 1967, STATE acted unreasonably in issuing precondemnation statements.

> 79. The delay of STATE in filing the condemnation actions after January 1, 1967, was excessive, unjustified, and oppressively interfered with the beneficial

use, possession, and enjoyment of the subject properties by LANDOWNERS.

80. As of January 1, 1967, the conduct of STATE in issuing precondemnation statements, excessively delaying condemnation, and other conduct specifically and directly interfering with LANDOWNERS' beneficial use, possession, and enjoyment of the properties was unreasonable and had become oppressive by January 1, 1967.

Relying on, among others, those facts just discussed, the Sacramento Superior Court concluded that an inverse condemnation of the landowners properties occurred on January 1, 1967 and continued until July 31, 1980. Moreover, the Superior Court determined that the appropriate date of valuation for the direct condemnation was July 31, 1980.

Clearly, it is not the function of this federal court in this proceeding to question the method by which the Sacramento Superior Court reached its conclusion regarding valuation of the properties. Indeed, the scope of this court's inquiry is limited to a review of the FHWA determination that the federal government should not participate in the acquisition costs set forth in the state court judgment, in part based on conduct of the State as reflected in the record. Because the state court decision is included in the record in these proceedings, this court does, however, take judicial notice of Sacramento Superior Court's findings of fact, noting the state court's characterization of the State's conduct as unjustified, oppressive, causing excessive delay, as well as simply inexplicable and unreasonable. The State also missed the court-ordered deadline, albeit only by a few days, and failed to comply in a timely manner with the order of the Sacramento Superior Court to make security deposits with the court for the subject properties in accordance with the court order in conformity with California law. These findings by the California court of competent jurisdiction make even more convincing the defendant's argument that the FHWA did not abuse its discretion in disallowing the State's claim arising from the July 28, 1982 judgment of

$13,821,881.60, especially based on Attachment 2 to PPM 21–4.1.

It is clear, in light of the above described sequence of events, that the FHWA acted within its discretion, and in accordance with FHWA regulations and applicable Policy and Procedure Memoranda when it disallowed the State's claim arising from the July 8, 1982 judgment of $13,821,881.60. The fact that the judgment entered in 1982 was the result of an inverse condemnation beginning in 1967 and the physical taking of land in 1972 by the State raises, in the mind of this court, serious issues as to whether the State properly presented its case and reasonably exercised all appropriate legal procedures as required by PPM 21–4.1, attachments thereto and applicable state law.

Finally, plaintiff in its original complaint filed with this court, in addition to requesting monetary damages, asserts a claim for declaratory relief. In a joint preliminary status report filed with this court, the defendant contended that this court lacked jurisdiction to entertain such a claim. Therefore, in order to remedy any possible jurisdictional defect, the plaintiff amended its complaint asserting a third claim. The third claim realleged all the allegations of the original complaint, but reformulated the declaratory judgment claim to also request monetary relief by alleging that the FMHA had refused to pay the State its proportional share of the inverse condemnation costs, and had thus breached its express contract with the State. The United States Supreme Court as well as this court and its predecessor, the United States Court of Claims, have consistently held that cases seeking relief other than for money damages are not within the jurisdiction of this court. *United States v. King*, 395 U.S. 1, 4–5, 89 S.Ct. 1501, 1502–1503, 23 L.Ed.2d 52 (1969); *Glidden Co. v. Zdanok*, 370 U.S. 530, 557, 82 S.Ct. 1459, 1476, 8 L.Ed.2d 671 (1962); *Austin v. United States*, 206 Ct.Cl. 719, 723, *cert. denied*, 423 U.S. 911, 96 S.Ct. 215, 46 L.Ed.2d 140 (1975); *AAI Corp. v. United States*, 22 Cl.Ct. 541, 545–46 (1991); *Continental Heller Constr. v. United*

*States*, 21 Cl.Ct. 471, 473 (1990), *aff'd, sub. nom., Essex Electro Engineers, Inc. v. United States*, 960 F.2d 1576 (Fed.Cir. 1992). In *Overall Roofing and Construction, Inc. v. United States*, 929 F.2d 687 (Fed.Cir.1991), the court found that the United States Claims Court should not be invested with broad declaratory relief power not allocated to the court by Congress. *Overall Roofing and Constr., Inc. v. United States*, 929 F.2d at 690. In the instant case, not only is the declaratory relief claim not properly formulated, but, in addition, the plaintiff cannot prevail on the merits of his claim and, therefore, certainly is not entitled to declaratory relief. Therefore, to the extent the claim for declaratory judgment, as set forth in the original and amended complaint, remains before this court, it is, hereby, dismissed.

### CONCLUSION

After a careful review of all the submissions and arguments presented by both parties, the court, hereby, GRANTS the defendant's motion for summary judgment. Plaintiff's motion for summary judgment is, therefore, DENIED. The clerk of the court is directed to dismiss plaintiff's complaint and to enter judgment in accordance with this decision.

IT IS SO ORDERED.